16-2016-CA-007685-XXXX-MA

Filing # 49917678 E-Filed 12/12/2016 03:14:12 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.:
DIVISION:

**ELIZABETH E. KATZ,**

      Plaintiff,

v.

**LOREN Z. CLAYMAN, M.D.,**
**LOREN Z. CLAYMAN, M.D., P.A.,**
**a Florida corporation,**
**ALLERGAN, INC.,**
**a foreign corporation,**
**ALLERGAN SALES, LLC,**
**a foreign limited liability company,** and
**ALLERGAN USA, INC.,**
**a foreign corporation,**

      Defendants.

_____/

## COMPLAINT

The Plaintiff, **ELIZABETH E. KATZ,** sues the Defendants, **LOREN Z. CLAYMAN,**

**M.D., LOREN Z. CLAYMAN, M.D., P.A.,** a Florida corporation, **ALLERGAN, INC.,** a

foreign corporation, **ALLERGAN SALES, LLC,** a foreign limited liability company, and

**ALLERGAN USA, INC.,** a foreign corporation, and alleges the following:

### GENERAL ALLEGATIONS

1.    This is an action for damages in excess of $15,000, exclusive of attorney's fees,

costs, and interest.

2.    All conditions precedent to the filing of this action have been performed or have

occurred.

3.    At all times material hereto, the Plaintiff, **ELIZABETH E. KATZ** (hereinafter

1

"Ms. Katz"), was and is a resident of, and permanently domiciled in, Middleburg, Clay County, Florida.

4.      At all times material hereto, the Defendant, **LOREN Z. CLAYMAN, M.D.** (hereinafter "Loren Z. Clayman"), was and is a resident of Jacksonville, Duval County, Florida.

5.      At all times material hereto, Loren Z. Clayman was and is a physician licensed to practice medicine by the State of Florida, who was and is practicing medicine in Duval County, Florida at his principal place of business located at 1801 Barrs Street, Suite 200, Jacksonville, Florida 32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

6.      At all times material hereto, Loren Z. Clayman held himself out as a specialist in the area of plastic surgery.

7.      At all times material hereto, the Defendant, **LOREN Z. CLAYMAN, M.D., P.A.** (hereinafter "Clayman PA"), was and is a Florida corporation, with its principal place of business at 1801 Barrs Street, Suite 200, Jacksonville, Florida 32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

8.      At all times material hereto, Loren Z. Clayman was and is an employee, agent or apparent agent of Clayman PA; at all times material hereto, Loren Z. Clayman was acting in the course and scope of his employment, agency or apparent agency with Clayman PA.

9.      The Defendant, **ALLERGAN, INC.**, is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

10.      The Defendant, **ALLERGAN, INC.**, is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise

placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

11.     The Defendant, **ALLERGAN, INC.**, may be reached for service of process in the State of Florida through its registered agent, CT Corporation System at 1201 Hays Street, Suite 105, Tallahassee, Florida 32301.

12.     The Defendant, **ALLERGAN SALES, LLC**, is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

13.     The Defendant, **ALLERGAN SALES, LLC**, is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

14.     The Defendant, **ALLERGAN SALES, LLC**, may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

15.     The Defendant, **ALLERGAN USA, INC.**, is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

16.     The Defendant, **ALLERGAN USA, INC.**, is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching,

testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

17.     The Defendant, **ALLERGAN USA, INC.**, may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

18.     The Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.**, are hereinafter collectively referred to as "Allergan."

### PROCEDURAL ALLEGATIONS

19.     On or about January 13, 2016, Ms. Katz caused to be filed a *Petition to Clerk for 90-Day Extension of Statute of Limitations* in the Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida, Case No.: 16-2016-CA-000222-XXXX-MA.

20.     On or about August 10, 2016, Ms. Katz caused to be mailed and served via Certified U.S. Mail, Return Receipt Requested, a *Notice of Intent to Initiate Litigation for Medical Malpractice* upon Loren Z. Clayman and Clayman PA pursuant to the authority of Section 766.106, *Florida Statutes*, and Rule 1.650, *Florida Rules of Civil Procedure.* On or about August 11, 2016 and August 12, 2016, the applicable *Notices* were received by Loren Z. Clayman and Clayman PA, respectively, or by representatives bearing a legal relationship to him/it.

21.     By a letter dated November 8, 2016, Loren Z. Clayman and Clayman PA (hereinafter collectively referred to as the "Clayman Defendants"), by and through their

authorized attorneys and representatives, made an offer to settle Ms. Katz' claims in amount that she rejected.

22.     Ms. Katz has complied with all conditions precedent and pre-suit requirements for the filing of the instant lawsuit.

## FACTUAL ALLEGATIONS

### Allergan's Natrelle Saline Filled Breast Implants

23.     In 1962, two Texas plastic surgeons performed the first breast augmentation surgery using silicone gel filled implants. In 1963, Dow Corning began manufacturing silicone gel filled breast implants based upon the Texas doctors' designs.

24.     Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants. In 1974 he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

25.     In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed. The new company's breast implants were still labeled McGhan breast implants. By this time the company was one of the largest breast implant manufacturers in the world.

26.     As a result of emerging safety concerns, in 1988 the United States Food and Drug Administration (FDA) re-classified silicone gel filled breast implants as Class III medical devices, which then required breast implant manufacturers to submit Pre-Market Approval (PMA) applications to the FDA to prove by valid scientific data that their respective implants were safe and effective.

27.    After reviewing the PMA applications of the different silicone breast implant manufacturers (including those of Inamed/McGhan), in 1992 the FDA prohibited the sale of silicone breast implants.

28.    In 1994, a $4 billion class action lawsuit over silicone filled breast implants was settled. Inamed contributed approximately $32,000,000 toward the settlement.

29.    In 1998, Inamed removed and replaced Donald K. McGhan from his position as chairman and chief executive of the company.[1]

30.    On November 16, 1999, Inamed filed a PMA for the "McGhan Medical RTV Saline-Filled Breast Implant," later known as the "Natrelle Saline-Filled Breast Implant." On May 10, 2000, the FDA issued a letter approving the PMA.

31.    In March of 2006, Inamed merged with Allergan, Inc., a company that makes products for eye care, neuroscience and dermatology, including its best known product, Botox, the injectable wrinkle treatment. Afterward, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

32.    On November 17, 2006, the FDA approved PMA's from both Allergan and Mentor (Allergan's main U.S. competitor in the design and manufacture of breast implants) for new silicone filled breast implants.

33.    On February 20, 2013, the FDA approved Allergan, Inc.'s PMA for the Natrelle 410, anatomically shaped highly cohesive silicone gel-filled breast implants, a type of breast implants that are commonly referred to as "gummy bear" implants. The new implants were softer, more cohesive, and more anatomically shaped than saline filled implants.

---

[1]    McGhan is currently serving the remainder of a 10-year prison sentence in Texas for wire fraud in relation to a scheme in which he attempted to use real estate investors' money for another breast implant business.

34.     In the last several years, silicone gel-filled implants have become the most commonly used types of breast implants in the U.S.

## ConfidencePlus Warranty

35.     With all Natrelle breast implants, Inamed/Allergan included its "ConfidencePlus Warranty." According to the ConfidencePlus warranty literature provided by Allergan, the warranty program applied to all FDA-approved Natrelle breast implants, provided the implants were used:

- As intended by appropriately qualified and licensed surgeons, in accordance with current and accepted plastic surgery techniques
- In accordance with the current *Natrelle* Breast Implant Directions for Use, found at www.allergan.com/labeling/usa.htm.

However, the warranty only applied to cases of:

- Loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention
- Capsular contracture (Baker Grade III/IV) with *Natrelle* Gel implants that requires surgical intervention

36.     Under Allergan's *ConfidencePlus Warranty Matrix*, the Standard warranty comes with Natrelle implants free of additional cost, while the Premier warranty cost an additional $100 until 2014, and $200 thereafter; both warranties have terms of coverage of 10 years. The Standard warranty provides for a lifetime replacement of the ruptured implant, replacement of the contralateral implant (for 10 years)[2], and $1,200 for the cost of replacement/revision surgery. The Premier warranty provides for lifetime replacement of both the ruptured and contralateral implants, plus $2,400 for the cost of replacement/revision surgery.

---

[2]     At first, only Natrelle Style 163 saline filled implants had lifetime replacement for contralateral breast implants; other Natrelle saline filled implants had only a 10 year warranty for contralateral implants. Beginning June 1, 2009, the Standard warranty was changed to provide for the lifetime replacement of contralateral breast implants for all Natrelle saline filled implants.

**Clayman Defendants**

37.     Loren Z. Clayman was first licensed as a medical doctor in the State of Florida on January 10, 1975.  On December 31, 1976, he completed a residency in plastic surgery, and he began practicing plastic surgery soon afterward in Jacksonville, Florida.  On October 2, 1978, he filed articles of incorporation for Clayman PA, with himself listed as both President and the Registered Agent of the new corporation.

38.     Loren Z. Clayman began performing breast augmentation surgeries as part of his plastic surgery practice.  During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

39.     After the FDA prohibited the sale of most silicone implants in 1992, Loren Z. Clayman began using saline filled implants almost exclusively.[3]

40.     By 2000, Loren Z. Clayman purchased at least a portion of the saline filled breast implants he used in augmentation procedures from Inamed/McGhan (later Allergan).  The majority (if not all) of saline filled breast implants her purchased from Inamed/McGhan were Natrelle saline filled breast implants.

41.     Before Ms. Katz first consulted with Loren Z. Clayman regarding breast augmentation, he began making a higher than average number of warranty claims for patients with saline filled implants.  In the vast majority of these claims, Loren Z. Clayman and/or Clayman PA alleged that one or more saline implants spontaneously ruptured/deflated through no fault of the patient or him.  Furthermore, Loren Z. Clayman and/or Clayman PA began making multiple, successive warranty claims for many of his/their patients.

---

[3]     Silicone filled breast implants could only be used for patients participating in ongoing medical studies, although it is unknown whether any of Loren Z. Clayman's patients participated in the studies.

42.     Even after the FDA once again permitted the sale of silicone filled breast implants in 2006, Loren Z. Clayman and/or Clayman PA continued using saline filled breast implants almost exclusively for breast augmentation procedures.

43.     After June 30, 2008, Loren Z. Clayman's son, Mark A. Clayman, M.D., joined Clayman PA and began practicing plastic surgery, including performing breast augmentation procedures.  For patients who received saline filled breast implants, Mark A. Clayman, M.D. also began making a higher than average number of warranty claims in which he alleged spontaneous ruptures/deflations through no fault of the patient or him.  Likewise, in many instances, Mark A. Clayman, M.D. made multiple, successive warranty claims for patients, and he rarely if ever used silicone filled implants for breast augmentation procedures.

44.     **Between 2001 and 2015, Clayman PA made warranty claims to Allergan for 5,516 pairs of Natrelle saline filled breast implants.**

45.     According to Allergan's follow up studies for Natrelle saline filled implants, the rate of spontaneous deflations is approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year.

46.     Pursuant to 21 C.F.R. §§ 814.80 and 814.82, Allergan has a continuing obligation to evaluate the "safety, effectiveness, and reliability" of medical devices such as Allergan Natrelle saline filled breast implants.  In accordance with these requirements, Allergan performs a "*Laboratory Analysis*" of each returned breast implant to determine the cause of an alleged rupture/deflation, after which a report is generated and maintained.  For the overwhelming majority of saline filled breast implants returned by Clayman PA to Allergan, Allergan found no identifiable causes for the claimed spontaneous ruptures/deflations.

47.     Nevertheless, to the best of the undersigned's knowledge and belief, Allergan paid every one of Clayman PA's warranty claims between 2001 and 2015.

## ELIZABETH E. KATZ

48.     On April 9, 2009, Ms. Katz (formerly Patten) presented to Loren Z. Clayman for a new patient consultation for breast augmentation. In the intake forms completed by Ms. Katz, she wrote that she wanted to discuss a breast augmentation and "nose surgery" because her breasts were "too small after breastfeeding" and her nose was "too big." Loren Z. Clayman failed to document any physical examination, any findings from a physical examination, any measurements of her breasts, any measurements of her nose, and any discussion of her clinical options. Instead, there is a surgical estimate for "Augmentation Mammoplasty" for the total price of $3,750.00, as well as a second surgical estimate for "Rhinoplasty" for the total price of $2,500.00.

49.     On May 15, 2009, Ms. Katz presented for her first breast surgery with Loren Z. Clayman at his office. There is no surgical intake sheet in Loren Z. Clayman's records for Ms. Katz, but on another form dated May 15, 2009, she stated that her bra size was 36 B, that her breasts sagged, that she wanted to be a D cup, but that she wanted to know how the implants would affect her ability to perform breast cancer self-examinations. In an operative note of the same date, Loren Z. Clayman documented an augmentation procedure in which he placed Allergan Natrelle Style 68 High Profile 465cc saline implants into her breasts at a subpectoral plane through inframammary incisions. According to the operative note, he inflated each implant to 550 ccs. According to the OR Record, the entire procedure took only 25 minutes.

50.     According to an office note dated May 22, 2009, Ms. Katz returned to Loren Z. Clayman's office for suture removal with complaints that her left implant was making a "weird

noise," and that she experienced "damage from lifting [her] 18 mth son." No physical examination is documented, nor is there any documentation as to Loren Z. Clayman's assessment of her complaints or any recommendations for them. In the patient follow up log, it is merely reported that she was "doing great."

51.    On September 24, 2009, Ms. Katz returned to Loren Z. Clayman with complaints of pain in her left breast. Once again, Loren Z. Clayman failed to document a physical examination, his findings (if any) from a physical examination, his diagnosis, or any discussion of Ms. Katz's clinical options. The patient follow up log states that she was seen with a "deflating left implant." There is also a surgical estimate prepared on that date for "Left deflation," "Bilateral Replacement," and "Larger" for no cost because "Co. will pay." There was no explanation documented as to why bilateral replacement was necessary, as opposed to simply the left implant.

52.    Ms. Katz presented for a second breast surgery at Loren Z. Clayman's office on October 26, 2009. According to the surgical intake purportedly completed by Ms. Katz, her left breast was "painful after augmentation," and she needed "[r]eplacement" due to "[l]eaking." At the time of this surgery, Ms. Katz reported that her bra size was 36 D. In the operative note of October 26, 2009, Loren Z. Clayman documented the removal and replacement of the left implant only. Specifically, he wrote that upon making an incision at the left breast, the implant was found to "have a partial deflation." He then removed the implant and replaced it with an Allergan Natrelle Style 68 High Profile 465 cc saline implant, which he filled with 550 ccs of saline. According to the OR Record, the left implant had a leak at the valve. The surgery took 20 minutes. A preoperative photograph taken at Loren Z. Clayman's office on October 26, 2009 demonstrates that she did not have a left implant deflation.

53.    On or about October 26, 2009, Loren Z. Clayman made a warranty claim to Allergan for the left implant, although the warranty paperwork is not included in his records for Ms. Katz.  Upon receiving the left implant, Allergan's personnel documented in a *Laboratory Analysis* report that white particles were observed on the inner and outer surfaces of the implant, and brown particles were observed in the fill channel; after the particles were removed, valve functioning was normal.  Nevertheless, on December 7, 2009, Allergan paid Loren Z. Clayman $1,200.00 for the surgery, and sent him at least one new implant.

54.    On November 2, 2009, Ms. Katz returned to Loren Z. Clayman's office for suture removal.  At that time, she reported a size difference between her two breasts, as well as "slight pain around nipple" on the left side.  Loren Z. Clayman's office note fails to document a physical examination, his diagnosis of her complaints, or any clinical recommendations relating to her complaints.

55.    On December 14, 2009, Ms. Katz returned to Loren Z. Clayman's office with complaints that the left implant was "still larger than [her] right implant."  Again, there is no documentation of a physical examination or of a discussion of her clinical options.  The follow up logs states that Ms. Katz "desire[d] increase of right."  A surgical estimate prepared on December 14, 2009 recites a right "increase" at no charge.

56.    Ms. Katz returned for a third breast surgery on February 17, 2010.  According to a surgical intake that she completed, her "right implant was much smaller" than the recently replaced left implant.  She also had occasional pain in her left breast, and she was concerned about the appearance of her scars.  However, a form purportedly signed by Ms. Katz states that her bra size was 36 D on the right, and 36 C on the left, which would be contrary to the intake form.  According to the operative report of February 17, 2010, upon making an incision at the

12

inframammary fold of the right breast, he found the implant had a "partial deflation" and was removed. He replaced the implant with an Allergan Natrelle Style 68 High Profile 465 cc saline implant, which he filled with 700 ccs of saline. In the OR Record, he gives as the reason for the deflation "Tissue in valve." Also according to the OR Record, the entire surgery took only 20 minutes. A preoperative photograph taken at Loren Z. Clayman's office on February 17, 2010 demonstrates that Ms. Katz did not have a right implant deflation.

57.     Once again Loren Z. Clayman made a warranty claim to Allergan, although the warranty paperwork was not included in Ms. Katz's records. After receiving the returned implant, Allergan's personnel recorded in the *Laboratory Analysis* report that there were white particles "on the inner surface of the implant," and brown particles "in the fill channel." Once the particles were removed, "valve functioning was then satisfactory." Nevertheless, on April 22, 2010, Allergan paid Loren Z. Clayman $1,200.00 and provided him with a new right implant.

58.     Presently, Ms. Katz's implants are too large, causing daily pain, tenderness, and the "side pockets" seem to be ripping. When she lies on her back, her implants "slide into her arm pits." The tops of her breasts are very tender to the touch or when she lies on her stomach. As such, she needs reconstructive breast surgery.

## COUNT I – CLAYMAN DEFENDANTS' MEDICAL NEGLIGENCE

59.     Ms. Katz re-alleges and incorporates by reference paragraphs 1 through 58.

60.     At all times material, Loren Z. Clayman owed Ms. Katz a duty to exercise that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably careful physicians caring for a patient such as Ms. Katz.

61.   On or between April 9, 2009, and March 1, 2010, Loren Z. Clayman and/or Clayman PA fell below the accepted and/or applicable standard of care in the treatment of Ms. Katz in one or more of the following ways:

(a).   By failing to properly document her medical care, treatment and surgeries. The quality of the clinic and operative records are, at best, poor and completely inadequate throughout Ms. Katz's care. None of the consultations or follow-up care contains any direct documentation by Loren Z. Clayman of their encounters. Specifically, no record of discussion with her and counseling with regard to her complaints. Also, no detailed description of her current complaints, her desired goal, family history of breast cancer, and no detailed past medical history, past surgical history, or medications were documented.  At a minimum, documentation should reflect the patient's subjective concerns, a review of pertinent medical history, physical assessments including direct measurements, and a synopsis of findings leading to the surgical recommendation.  The office notes do not contain detailed physical exams, detailed assessments/plans, or detailed documentation of the informed consent process.  Lack of appropriate documentation of follow-up visits is also a serious concern.  No physician assessments or specific plans of care are documented.

(b).   By failing to have a documented discussion about her options regarding breast implants.  In the records of Loren Z. Clayman, no discussion of implant size is documented.  Patients should have the opportunity to try different size implants for dimensional planning and have a documented discussion regarding incision placement, tissue plane (pre/subpectoral), implant type, and implant size.  In Ms. Katz's records, there are only discussions of implant type.

(c).    By failing to properly document with photographs his medical care, treatment, and surgeries. The photographic documentation in Ms. Katz's medical records is also inadequate. At the very minimum, lateral and oblique views should be obtained. Standardization of photo background and lighting is also important and considered standard of care as it allows not only a means of further objective assessment of the problem, but also a means of comparison over time. The few photos in the records are poorly reproduced "Polaroids" that only show a frontal view from different depths and perspectives.

(d).    Failing to assess Ms. Katz's needs based upon her specific, personal anatomy and medical conditions at the times she presented, as opposed to taking a "one-size-fits-all" approach to her clinical planning.  There is no discussion at her initial preoperative visit that Ms. Katz had banding across the lower pole of both breasts, or that she presented with a "double bubble" deformity preoperatively. This should have at least been an initial "red flag" to Loren Z. Clayman as to the relatively weak status of the existing infra-mammary fold structure.  The infra-mammary fold is a natural and physiologic boundary of the inferior breast, and its integrity is important in maintaining implant position on the chest wall.  A weakened infra-mammary fold will result in inferior displacement. Ms. Katz's complaints of continued asymmetry are in large part due to an inferior right breast implant malposition relative to the left breast and its resultant lack of upper pull fullness on the right side.  Significantly, the failure to appropriate manage this problem caused the progressive lengthening of the nipple and infra-mammary fold distance as is documented in the chronological progression of preoperative photographs. Position of the nipple on the breast mound is also noteworthy

as, especially the right breast nipple, from the second through fourth surgeries the nipples maintain high positions on the breast mound.

(e).    By instructing Ms. Katz to document complaints or conclusions that were incorrect. Loren Z. Clayman has said the following, "We were instructed to put in our notes that the implants may be leaking as the reason for the surgery." Whether the implants are leaking or not, it is never appropriate, and should be considered fraudulent, if patients are instructed to document anything specific in the medical record. With regard to these entries, it is apparent that instructing patients such as Ms. Katz to enter that as part of their subjective complaints would give Loren Z. Clayman and/or his representatives credibility to request compensation from the implant manufacturer not only for the operation itself but for compensation in additional implants despite having normal laboratory findings of the implants.

(f).    By failing to engage in appropriate preoperative assessments, counseling, and planning with the patient, which was then exacerbated by poor execution of surgeries. Ms. Katz's complaints and persistent deformities were set in motion iatrogenically by poor preoperative counseling and assessment, as well as poor intra-operative execution of a surgical plan from the time of the first surgery and thereafter. As the progression of preoperative photographs demonstrates, there is no interval improvement in the malposition of the implants; in particular, the right breast implant remained inferiorly malpositioned throughout her course of care and treatment. It was her right breast that was her primary complaint throughout her care, and this was reported by Ms. Katz on every preoperative questionnaire. Indeed, she continued to be asymmetric despite further operative interventions. This was due to Loren Z. Clayman's inadequate

initial assessment of the quality of the infra-mammary folds and her ability to support a larger, overfilled saline implant.

(g).   Failing to counsel Ms. Katz as to realistic and safe goals for her surgeries. As reflected in the progressive inferior malposition settling or "bottoming out" demonstrated in the preoperative photographs, Ms. Katz required a procedure to strengthen the inframammary folds.   This could have been accomplished by direct incisional approaches along the length of the folds, followed by securing the folds to the lower chest wall or upper abdominal skin against the chest wall to provide strengthened folds and adequate implant position on the chest wall. With a fold repositioning and strengthening, the implant pocket should have been dissected further to accommodate the more cephalad, position of the breast implant upon the chest wall.  Loren Z. Clayman failed to provide or even offer such a procedure to Ms. Katz, with the result being her progressive "bottoming out."   Furthermore, prolonged malposition of the lower poles location and worsening of Ms. Katz's ptosis or pseudo-ptosis resulted in significant lower pole expansion (sagging), which was manifested by the increased nipple fold length seen progressively in the preoperative photographs.   At this time, the lower pole expansion and increased nipple fold length can be corrected only through extensive implant capsule work and another direct incisional approach at the lower pole to reduce the vertical height.

(h).   By repeatedly operating on Ms. Katz and claiming that her implants had deflated, Loren Z. Clayman, M.D. placed her at increased risk for surgical and anesthetic complications. These revision surgeries could have been avoided if, during the first surgery, Loren Z. Clayman, M.D. had used appropriately sized implants after adequate

pre-surgical dimensional planning and use of sizing implants. Additionally, silicone gel implants should have been offered or at least considered after the first and subsequent revision surgeries. The benefits of switching to the silicone implants include a negligible risk of implant rupture and deflation, as well as a softer, less painful, and more natural feel without rippling compared to overfilled saline implants.

(i).     Failing to treat Ms. Katz in a professional manner. Ms. Katz has indicated that Loren Z. Clayman examined her in a very unprofessional manner, standing behind the patient and touching her breasts as they looked in a mirror, with his body touching hers, with no female nurse present.

(j).     Failing to be candid with Ms. Katz. Within a reasonable degree of medical probability, Ms. Katz did not experience successive spontaneous deflations of her saline filled implants as described by Loren Z. Clayman, M.D. In its follow-up studies, Allergen reported spontaneous saline filled implant deflation rates of 2.7-6.8% at five years, and 10 to 13.8% at 10 years, averaging roughly a risk of 1.2% per year. Based on this information, the odds against Ms. Katz experiencing this number of spontaneous deflations are astronomical. Upon review of Allergan, Inc.'s *Laboratory Analysis* reports, there were no defects found in the valves or implant shells that would support the diagnoses of spontaneous deflation. Furthermore, apparently only one of the implants claimed to have been malfunctioning in the April 19, 2010 operative report was submitted for review to Allergan. If these were in fact actual instances of deflation that required re-operation (which they were not), the implant used in the revision surgery should not have been the same or equal volume as the prior surgery (as it was between the last two surgeries).

(k).    Performing hasty in-office augmentations under IV sedation with overfilled saline implants in a "one-size-fits-all" approach to patient care. While the implants fill out the breast skin envelope, the results are unnatural and asymmetric with unreasonable stretching of the skin and ptosis. Typically, Loren Z. Clayman then treats the consequences of his "one-size-fits-all" approach to breast surgery with further saline implant breast augmentation, only accentuating underlying asymmetries and making the problem worse.

(m).    Failing to use appropriate anesthesia under the circumstances for the initial purported subpectoral breast augmentation and subsequent revisions. Loren Z. Clayman, M.D. used the sedation protocol of ketamine and versed, which was administered by a registered nurse and not a certified registered nurse anesthetist (CRNA). This is significant, as the difference between a certified registered nurse anesthetist and a registered nurse is the ability to manage an airway during the procedure. The lack of presence of someone who is trained to manage an airway under sedation leads to significant under-sedation, which was evident in this case. Intravenous sedation should be deep enough to adequately perform the procedure without the patient recalling the procedure or experiencing intraoperative pain. Ms. Katz experienced recollections of the surgeries, as well as significant discomfort and anxiety during the procedures. Subpectoral breast augmentation should be performed under a general anesthetic, and, preferably, with the use of muscle paralytics. The inadequate intravenous sedation during Ms. Katz's procedures more likely than not lead to an inadequate subpectoral plane and pocket development, and likely caused or contributed to the implants being inferiorly malpositioned. Additionally, given Ms. Katz's initial

experience with under-sedation, she should have been offered general anesthesia because her revision surgeries were significantly more involved than her initial breast augmentation procedure.   More likely than not, Loren Z. Clayman, M.D. took into account the limitations of intravenous sedation when he performed the revision surgeries. There was no legitimate medical justification for choosing intravenous sedation administered by a registered nurse for these procedures.   It appears that Loren Z. Clayman, M.D. chose this approach merely to control costs.

(o).   Excessively overfilling her breast implants.

(p).   Failing to take measures to prevent infectious agents or materials from getting into the breast implants.

(q).   Failing to appropriately evaluate or assess her post-surgical complications or complaints.

(r).   Failing to appropriately treat her post-surgical complications or complaints.

(s).   By concealing or intentionally misrepresenting the cause of her post-surgical complications or complaints.   This is likely because he has a system in place to fund replacement implants and re-operations through the manufacturer's warranty, without needing to provoke the patient by attempting to bill her for the re-operations.

62.   As a direct and proximate result of above noted breach or breaches of the standard of care by Loren Z. Clayman and/or Clayman PA, Ms. Katz suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical

and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

63.     Furthermore, on one or more occasions Loren Z. Clayman and/or Clayman PA fraudulently concealed or intentionally misrepresented to Ms. Katz and/or others that a saline implant that had been implanted in her body spontaneously deflated or ruptured; such fraud, concealment, or intentional misrepresentation caused Ms. Katz to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of the applicable standard of care by Loren Z. Clayman and/or Clayman PA.

WHEREFORE, the Plaintiff, **ELIZABETH E. KATZ,** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.** and **LOREN Z. CLAYMAN, M.D., P.A.** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

### COUNT II – CLAYMAN DEFENDANTS' BREACH OF FIDUCIARY DUTY

64.     Ms. Katz re-alleges and incorporates by reference paragraphs 1 through 58.

65.     On or between April 9, 2009, and March 1, 2010, Ms. Katz was a patient of Loren Z. Clayman.  By virtue of the physician-patient relationship, Loren Z. Clayman had a fiduciary duty to Ms. Katz to not perform acts for his/their own pecuniary gain that were contrary to her welfare.

66.     Loren Z. Clayman and/or Clayman PA violated this fiduciary duty to Ms. Katz in one or more of the following ways:

        (a).     By claiming that her breast implants had deflated when in fact they had not.

21

(b).    By successively operating on Ms. Katz without addressing her actual problems, which placed her at an increased risk for surgical and anesthetic complications.

(c).    By repeatedly not performing the surgery that her physical condition actually required (i.e. a mastopexy) in favor of surgery that took less time and skill, to save Loren Z. Clayman and/or Clayman PA time and money.

(d).    By repeatedly operating on her when he knew or should have known that he did not have the skill or competency to perform the surgeries within the standard of care.

(e).    By repeatedly operating on her so that Loren Z. Clayman and/or Clayman PA could recover a surgical fee from Allergan each time.

(f).    By performing surgery with inadequate anesthesia because it was cheaper, which in turn led to improper implant placement as well as increased pain, discomfort, and anxiety.

67.    Furthermore, on one or more occasions Loren Z. Clayman fraudulently concealed or intentionally misrepresented to Ms. Katz and/or others that a saline implant that had been implanted in her body had spontaneously deflated; such fraud, concealment, or intentional misrepresentation caused Ms. Katz to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of Loren Z. Clayman's fiduciary duties to her.

68.    As a direct and proximate result of Loren Z. Clayman breaches of his fiduciary duties to Ms. Katz, she suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and

aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff, **ELIZABETH E. KATZ**, demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.**, and **LOREN Z. CLAYMAN, M.D., P.A.**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT III – CLAYMAN DEFENDANTS' VIOLATIONS OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

69.     Ms. Katz re-alleges and incorporates by reference paragraphs 1 through 58.

70.     On one or more occasions between April 9, 2009, and March 1, 2010, Loren Z. Clayman and/or Clayman PA, engaged in one or more of the following acts:

(a).     Caused or allowed to be printed, published, or otherwise disseminated to the general public advertisements soliciting patients for "Loren Z. Clayman's Plastic Surgery Center & Miracle Spa" when there is no organized entity or even a registered fictitious name for such an entity or organization.

(b).     Caused or allowed to be printed, published, or otherwise disseminated to the general public advertisements that represented that Loren Z. Clayman had the experience, competence and finesse to produce extraordinary surgical results, when in fact such representations were false.

(c).     Represented to Ms. Katz and/or others that a saline implant that had been implanted in her had spontaneously ruptured or deflated, when in fact it had not.

71.     The aforementioned acts of Loren Z. Clayman and/or Clayman PA were "[u]nfair methods of competition, unconscionable acts or practices, or unfair or deceptive practices" as

contemplated by Section 501.204, *Florida Statutes*.

72.     Ms. Katz is a "consumer" and Loren Z. Clayman and/or Clayman PA were and are engaged in "trade or commerce," as both terms are defined in Section 501.203 (7) and (8), Florida Statutes.

73.     As a direct and proximate result of the aforesaid acts of Loren Z. Clayman and/or Clayman PA, Ms. Katz suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

74.     Furthermore, as a direct and proximate result of the aforesaid acts of Loren Z. Clayman and/or Clayman PA, Ms. Katz spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which caused her to need future medical care and incur related expenses to correct the damages done by said past medical and/or surgical care of Loren Z. Clayman and/or Clayman PA.

75.     As a result of the aforesaid acts of Loren Z. Clayman and/or Clayman PA, Ms. Katz has retained or employed the undersigned law firm, and she has agreed to pay the firm a reasonable fee for its services in that regard.

WHEREFORE, the Plaintiff, **ELIZABETH E. KATZ**, seeks the following relief:

(a).     Judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.,** and/or **LOREN Z. CLAYMAN, M.D., P.A.**

(b).     The court costs of this action, and attorney's fees pursuant to Sections 501.2105 and 501.211(2), *Florida Statutes*.

24

(c).    A declaratory judgment that one or more acts or practices of one or more of the

Defendants violated the *Florida Deceptive and Unfair Trade Practices Act.*

(d).    An order enjoining one or more of the Defendants from engaging in the above

noted acts or practices.

(e).    The Plaintiff further demands a trial by jury on all issues so triable.

## COUNT IV – CLAYMAN DEFENDANTS' FRAUD

76.    Ms. Katz re-alleges and incorporates by reference paragraphs 1 through 58.

77.    On one or more of the below occasions, Loren Z. Clayman and/or Clayman PA

made the following false statements or representations, which were intended to conceal his

inability to perform the breast augmentation procedures competently and within the standard of

care, and which in fact misled Ms. Katz and/or caused her to respond in the following ways to

her detriment:

(a).    On April 9, 2009, Loren Z. Clayman represented to Ms. Katz that he was a

competent plastic surgeon who could perform breast augmentation and related procedures

in a reasonably competent manner that was within the standard of care.    This

representation was false because he was not in fact reasonably competent to perform the

requested procedures within the standard of care.  This representation caused Ms. Katz to

choose Loren Z. Clayman for breast surgery as opposed to other plastic surgeons.

(b).    On April 9, 2009, Loren Z. Clayman represented to Ms. Katz that he knew

the appearance that she wanted for her breasts, and that he could achieve that appearance

through the planned surgery.  In fact, whether Loren Z. Clayman knew what appearance

she desired or not, he did not have the ability or intention to perform the procedures

necessary to provide her with the desired appearance.  This representation caused Ms.

Katz to choose Loren Z. Clayman for breast surgery as opposed to other plastic surgeons who would have been able to provide her with the desired appearance.

(c).   On September 24, 2009, Loren Z. Clayman told Ms. Katz that her left breast implant had a rupture, leak, or deflation, and he further told her that she needed to undergo surgery to remove and replace it (he repeated these representations in the operative report dated October 26, 2009).  In fact, she did not have a rupture, leak, or deflation at her left breast implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Katz to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgeries, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Katz did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(d).   On September 24, 2009, Loren Z. Clayman provided Ms. Katz with a written surgical estimate that stated that she needed surgery for a "Left deflation," that she needed to have a "Bilateral Replacement," that she had stated that she wanted both of her breasts to be "Larger," all for which the "Co. will pay."  In fact, she did not have a rupture, leak, or deflation at her left breast implant, Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts, Loren Z. Clayman intended to only remove one of her breast implants, and she did not request to have *both* of her breasts made larger.  These representations caused Ms. Katz to conclude that the problems she was experiencing with her breasts were not the result of Loren Z.

26

Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Katz did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(e). In the process of having Ms. Katz sign the informed consent paperwork on or about October 26, 2009, Loren Z. Clayman and/or a Clayman PA employee told her that she had a rupture, leak, or deflation at her left breast implant. In fact, she did not have a rupture, leak, or deflation at her left breast implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Katz to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Katz did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(f). On or about October 26, 2009, Loren Z. Clayman made a warranty claim to Allergan in which he reported that Ms. Katz' left breast implant had a rupture, leak, or deflation. In fact, she did not have a rupture, leak, or deflation at her left breast implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Katz to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant;

these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Katz did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(g).    In the process of having Ms. Katz sign the informed consent paperwork on or about February 17, 2010, Loren Z. Clayman and/or a Clayman PA employee told her that she had a rupture, leak, or deflation at her right breast implant.  In fact, she did not have a rupture, leak, or deflation at her right breast implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Katz to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Katz did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(h).    On or about February 17, 2010, Loren Z. Clayman made a warranty claim to Allergan in which he reported that Ms. Katz' right breast implant had a rupture, leak, or deflation.  In fact, she did not have a rupture, leak, or deflation at her right breast implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Katz to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another

28

surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Katz did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

78.     As a result of the above false statements or representations, Loren Z. Clayman, and/or Clayman PA were able to continue collecting money in relation to the medical and surgical care of Ms. Katz, Ms. Katz delayed seeking a second opinion from another plastic surgeon, and/or Ms. Katz delayed seeking legal counsel for potential medical negligence.

79.     As a direct and proximate result of the above noted false statements or representations of Loren Z. Clayman and/or employees or agents of Clayman PA, Ms. Katz suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

80.     Furthermore, as a direct and proximate result of the above noted false statements or representations by Loren Z. Clayman and/or employees or agents of Clayman PA, Ms. Katz spent monies in the amount of $3,750 or more for breast augmentation surgery and related medical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses for medical and surgical care to correct the damage done by Loren Z. Clayman and/or Clayman PA.

WHEREFORE, the Plaintiff, **ELIZABETH E. KATZ**, demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.** and **LOREN Z. CLAYMAN, M.D., P.A.** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury

on all issues so triable.

## COUNT V – CLAYMAN DEFENDANTS AND ALLERGAN'S CONSPIRACY TO

## COMMIT FRAUD AND/OR BREACH OF FIDUCIARY DUTY

81.    Ms. Katz re-alleges and incorporates by reference paragraphs 1 through 58.

82.    On or before April 9, 2009, Loren Z. Clayman and/or Clayman PA entered into an

agreement with Allergan to commit fraud and/or breach of fiduciary duty.

83.    Ms. Katz re-alleges and incorporates by reference paragraphs 65 through 67 as the

allegations of conduct by Loren Z. Clayman and/or Clayman PA in furtherance of the breach of

the fiduciary duty owed by Loren Z. Clayman and/or Clayman PA to Ms. Katz.

84.    Ms. Katz re-alleges and incorporates by reference paragraphs 77 and 78 as the

allegations of fraud upon Ms. Katz committed by Loren Z. Clayman and/or Clayman PA.

85.    Allergan committed one or more of the following overt acts in furtherance of the

conspiracy to commit fraud and/or breach of fiduciary duty:

(a).    Continuing to sell Loren Z. Clayman and/or Clayman PA saline filled

breast implants until April 9, 2009, despite the following:

(1).    Loren Z. Clayman and/or Clayman PA had previously made
hundreds of warranty claims to Allergan for saline filled breast implants for which
Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell
integrity, resulting in implant rupture or deflation that required surgical
intervention," and, thus, the explant surgeries were not necessary as result of
failed breast implants; and

(2).    The rate of rupture/deflations of Natrelle saline filled implants
claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the
rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(b).    Failing to report Loren Z. Clayman and/or Clayman PA to the appropriate

authorities before April 9, 2009, despite the following:

30

(1).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(2).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(c).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA,

without requesting further corroboration, in relation to the left saline filled breast implant

that Loren Z. Clayman placed into Ms. Katz on May 15, 2009, and which Loren Z.

Clayman surgically removed on October 26, 2009, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Katz on May 15, 2009, and explanted from Ms. Katz by Loren Z. Clayman on October 26, 2009, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the October 26, 2009 surgery was not necessary as a result of a failed breast implant;

(2).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(3).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(d).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA,

without requesting further corroboration, in relation to the right saline filled breast

implant that Loren Z. Clayman placed into Ms. Katz on May 15, 2009, and which Loren

Z. Clayman surgically removed on February 17, 2010, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Katz on May 15, 2009, and explanted from Ms. Katz by Loren Z. Clayman on February 17, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the February 17, 2010 surgery was not necessary as a result of a failed breast implant;

(2).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Katz on May 15, 2009, and explanted from Ms. Katz by Loren Z. Clayman on October 26, 2009, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the October 26, 2009 surgery was not necessary as a result of a failed breast implant;

(3).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(4).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(e).    Continuing to sell saline filled breast implants to Loren Z. Clayman and/or Clayman PA on or between April 9, 2009, and March 1, 2010, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Katz on May 15, 2009, and explanted from Ms. Katz by Loren Z. Clayman on February 17, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the February 17, 2010 surgery was not necessary as a result of a failed breast implant;

(2).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Katz on May 15, 2009, and explanted from Ms. Katz by Loren Z. Clayman on October 26, 2009, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the October 26, 2009 surgery was not necessary as a result of a failed breast implant;

(3).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell

integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(4). The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(f). Failing to report Loren Z. Clayman and/or Clayman PA to the appropriate authorities on or between April 9, 2009, and March 1, 2010, despite the following:

(1). Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Katz on May 15, 2009, and explanted from Ms. Katz by Loren Z. Clayman on February 17, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the February 17, 2010 surgery was not necessary as a result of a failed breast implant;

(2). Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Katz on May 15, 2009, and explanted from Ms. Katz by Loren Z. Clayman on October 26, 2009, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the October 26, 2009 surgery was not necessary as a result of a failed breast implant;

(3). Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(4). The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

86. As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman and/or Clayman PA, and also by Allergan, Ms. Katz suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of

a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

87.     Furthermore, as a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman and/or Clayman PA, and also by Allergan, Ms. Katz has spent monies in the amount of $3,750 or more, for medical and/or surgical care related to her breasts by Loren Z. Clayman and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **ELIZABETH E. KATZ**, demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A., ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VI – ALLERGAN AIDING AND ABETTING FRAUD
## AND/OR BREACH OF FIDUCIARY DUTY

88.     Ms. Katz re-alleges and incorporates by reference paragraphs 1 through 58.

89.     Ms. Katz re-alleges and incorporates by reference paragraphs 65 through 67 as the allegations of conduct by Loren Z. Clayman and/or Clayman PA in furtherance of the breach of the fiduciary duty owed by Loren Z. Clayman and/or Clayman PA to Ms. Katz.

90.     Ms. Katz re-alleges and incorporates by reference paragraphs 77 and 78 as the allegations of fraud upon Ms. Katz committed by Loren Z. Clayman and/or Clayman PA.

91.     Allergan, through its employees or agents, knew that Loren Z. Clayman and/or Clayman PA, was committing fraud upon Ms. Katz, and/or breaching a fiduciary duty owed to

Ms. Katz, due to the following:

(a).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Katz on May 15, 2009, and explanted from Ms. Katz by Loren Z. Clayman on February 17, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the February 17, 2010 surgery was not necessary as a result of a failed breast implant;

(b).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Katz on May 15, 2009, and explanted from Ms. Katz by Loren Z. Clayman on October 26, 2009, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the October 26, 2009 surgery was not necessary as a result of a failed breast implant;

(c).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(d).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

92.    Despite the aforesaid knowledge of Allergan through its employees or agents, Allergan provided substantial assistance to Loren Z. Clayman and/or Clayman PA in committing fraud against Ms. Katz, and/or breaching a fiduciary duty owed to Ms. Katz, in one or more of the following ways:

(a).    Continuing to sell Loren Z. Clayman and/or Clayman PA saline filled breast implants until April 9, 2009;

(b).    Failing to report Loren Z. Clayman and/or Clayman PA to the appropriate authorities before April 9, 2009;

(c).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left saline filled breast implant that Loren Z. Clayman placed into Ms. Katz on May 15, 2009, and which Loren Z. Clayman surgically removed on October 26, 2009;

(d).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the right saline filled breast implant that Loren Z. Clayman placed into Ms. Katz on May 15, 2009, and which Loren Z. Clayman surgically removed on February 17, 2010;

(e).    Continuing to sell saline filled breast implants to Loren Z. Clayman and/or Clayman PA on or between April 9, 2009, and March 1, 2010; and

(f).    Failing to report Loren Z. Clayman and/or Clayman PA to the appropriate authorities on or between April 9, 2009, and March 1, 2010.

93.    As a direct and proximate result of the substantial assistance provided by Allergan to Loren Z. Clayman and/or Clayman PA, Ms. Katz suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

94.    Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan to Loren Z. Clayman and/or Clayman PA, Ms. Katz has spent monies in the amount of $3,750 or more, for medical and/or surgical care related to her breasts by Loren Z. Clayman and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **ELIZABETH E. KATZ**, demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VII – ALLERGAN'S STRICT LIABILITY FOR DEFECTIVE PRODUCTS

95.    Ms. Katz re-alleges and incorporates by reference paragraphs 1 through 58.

96.    Allergan designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants:  left and right Natrelle Style 68 High Profile 465 saline breast implants with serial numbers 13689941 and 14131044, respectively, that were implanted into Ms. Katz on May 15, 2009, and explanted from Ms. Katz on October

26, 2009, and February 17, 2010, respectively; a left Natrelle Style 68 High Profile 465cc saline

breast implants with serial number 14318593 that was implanted into Ms. Katz on October 26,

2009; and a right Natrelle Style 68 High Profile 465cc saline breast implants with serial number

14778432, that was implanted into Ms. Katz on February 17, 2010.

97.     At all times material, Allergan expected the aforesaid saline filled breast implants

to reach, and one or more pairs did in fact reach, consumers in the State of Florida, including Ms.

Katz, without substantial changes in the condition in which they were sold or distributed.

98.     At all times material, the aforesaid saline filled breast implants were being used in

the manner intended, or based upon all of the circumstances, reasonably expected, by Allergan.

99.     At all times material, one or more of the aforesaid saline filled breast implants

was in fact defective and in an unreasonably dangerous condition at the time it was placed into

the stream of commerce, and when put to its reasonably anticipated use, in one or more of the

following ways:

a.     Design

(1).     One or more of saline filled breast implants was designed such that

the valve permitted liquids from inside a patient's body cavity to travel

inside the implant shell and spread infectious agents; or

(2).     One or more of the aforesaid saline filled breast implants was

designed such that the valve allowed saline fluid to escape from the

implant shell, causing the need for subsequent surgery to replace the

implant; and

(3).     Prior to May 15, 2009, a safer alternative design for the aforesaid

saline filled breast implants existed and was commercially feasible; and

(4).    The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.    <u>Manufacture</u>

One or more of the aforesaid saline filled breast implants was defectively manufactured such that

(1).    the valve permitted liquids from inside a patient's body cavity to travel inside the implant shell and spread infectious agents; or

(2).    the valve allowed saline fluid to escape from the implant shell causing the need for subsequent surgery to replace the implant.

c.    <u>Warning</u>

(1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of its valve permitting liquids from inside a patient's body cavity to travel inside the implant shell and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of its valve allowing saline fluid to escape from the implant shell, causing the need for a subsequent surgery to replace the implant.

100.    The defective condition of one or more of the aforesaid saline filled breast implants subjected patients receiving the breast implants to infection or rupture/deflation, which exceeded the benefits of the products, and for which safer products were available.    This

defective condition made one or more of the aforesaid saline filled breast implants unreasonably dangerous when put to use as intended or reasonably expected by Allergan.

101. The defective condition of one or more of the aforesaid saline filled breast implants directly caused or contributed to cause Ms. Katz to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff, **ELIZABETH E. KATZ**, demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VIII – ALLERGAN'S PRODUCT NEGLIGENCE

102. Ms. Katz re-alleges and incorporates by reference paragraphs 1 through 58.

103. Allergan was and is the entity that designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants: left and right Natrelle Style 68 High Profile 465 saline breast implants with serial numbers 13689941 and 14131044, respectively, that were implanted into Ms. Katz on May 15, 2009, and explanted from Ms. Katz on October 26, 2009, and February 17, 2010, respectively; a left Natrelle Style 68 High Profile 465cc saline breast implants with serial number 14318593 that was implanted into Ms. Katz on October 26, 2009; and a right Natrelle Style 68 High Profile 465cc saline breast implants with serial number 14778432, that was implanted into Ms. Katz on February 17, 2010;

accordingly, at all times material Allergan owed one of more of the following duties to the patients who received the implants in surgeries:

(a).    to properly design, assemble, and manufacture the aforesaid Natrelle saline filled breast implants so that none of them created an unreasonable risk of harm, bodily injury, or death to their users or consumers;

(b).    to provide labels and packaging materials that adequately warned implanting surgeons and the using public of the risks and dangers associated with the aforesaid Allergan Natrelle saline filled breast implants, including but not limited to the risk of their valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents, as well as the risk of the valves allowing saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and/or

(c).    to conduct adequate testing on the aforesaid Natrelle saline filled implants before releasing them into the stream of commerce to ensure that they were reasonably safe for their intended use.

104.    On or before May 15, 2009, Allergan knew or should have known that the aforesaid Natrelle saline filled breast implants posed an unreasonable risk of harm, bodily injury, or death to its users, the patients who had them implanted into them.

105.    Allergan breached the duties it owed to its users, the patients who had Natrelle saline filled breast implants implanted into them, in one or more of the following ways:

a.   Design

(1).   One or more of the aforesaid saline filled breast implants was designed such that the valve permitted liquids from inside a patient's body cavity to travel inside the implant shell and spread infectious agents; or

(2).   One or more of the aforesaid saline filled breast implants was designed such that the valve allowed saline fluid to escape from the implant shell, causing the need for subsequent surgeries to replace the implant; and

(3).   Prior to January 30, 2009, a safer alternative design for the aforesaid saline filled breast implants existed and was commercially feasible; and

(4).   The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.   Manufacture

One or more of the aforesaid saline filled breast implants was defectively manufactured such that

(1).   The valve permitted liquids from inside a patient's body cavity to travel inside the implant shell and spread infectious agents; or

(2).   The valve allowed saline fluid to escape from the implant shell causing the need for subsequent surgery to replace the implant.

c.   Warning

(1).   One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of its valve permitting liquids from inside a patient's body cavity to travel inside the implant shell and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained

inadequate warning of the risks of its valve allowing saline fluid to escape from

the implant shell causing the need for subsequent surgery to replace the implant.

106.    Allergan's breach of the duty or duties it owed to users of Natrelle saline filled

breast implants, including Ms. Katz, directly caused or contributed to cause Ms. Katz to suffer

bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss

of the capacity for the enjoyment of life, has incurred and will incur in the future expense of

hospitalization, medical and nursing care and treatment, and aggravation of a previously existing

condition. These losses are permanent or continuing in nature, and she will suffer them in the

future.

WHEREFORE, the Plaintiff, **ELIZABETH E. KATZ**, demands judgment for damages

against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN**

**USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial

by jury on all issues so triable.

## CERTIFICATE OF REASONABLE INVESTIGATION

The undersigned counsel hereby certifies that he has made a reasonable investigation as
permitted by the circumstances which have given rise to a good faith belief that grounds exist for
the bringing of this action.

/s/ Christopher Shakib
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida 32202
Telephone:    (904) 632-2424
Facsimile:    (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: thowell@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiffs

43

/s/ Leslie A. Goller
**Leslie A. Goller, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida 32202
Telephone:     (904) 632-2424
Facsimile:     (904) 632-5049
Primary Email: lgoller@terrellhogan.com
Secondary Email: lkipp@terrellhogan.com
Florida Bar No.: 0393932
Attorney for the Plaintiffs